will be case number 15-1672 United States v. Paul Hinkel Good morning. May it please the Court. My name is Christine DiMasso and I represent the appellant Paul Hinkel. I would like to reserve three minutes of my time for rebuttal. You may. Government sting operations can be an appropriate investigatory tool. However, as this Court and the Supreme Court have repeatedly recognized, there are limits to how the government can In this case, government agents put a potentially titillating ad on Craigslist. The government was not operating in a forum catering to pedophilia or child pornography. It posted a legal-appearing ad on a well-known and frequently used website that contains everything from job postings to listings for used furniture to adult personal ads. But only when it received responses did the government disclose the potential illegality here. Trolling in this publicly available, often used forum, the government agents caught Mr. Hinkel, a man with no criminal record, no history of inappropriate conduct with minors, no evidence that he ever had any child pornography, and this is a man who repeatedly, during his conversation with agents, expressed reservations about the illegal conduct. This Court He expressed reservations, but he continually stayed on board. And I think a lot of that has to do with the type of inducement that was used in this case. And the type of inducement that was used in this case, this Court and others, this Court has recognized the potential impropriety of the type of inducement used in this case, and other courts, the Ninth Circuit and the Nebraska Supreme Court particularly, have gone further and have said that the type of inducement is improper. This type of inducement is the sort of sexual mentor sting, where the government agents are posing as a parent, seeking as part of their parental responsibility to find an appropriate sexual partner for a minor. Well, apart from the fact that even the Nebraska case and the Ninth Circuit case are binding on us, there are important factual distinctions between those cases and this case. But to get back to the question Judge Thompson asked you, the reservations that your client expressed were mainly not to the conduct itself, but to whether or not the minor was a willing adult. Whether she was, to use his phrase, with it, or whether she was up for it. I do believe that he did also express sort of general reservations. He expressed those reservations once. And when the scene correspondent responded to the scene, it would be illegal. I guess that's the end of the conversation. His reply was, no it isn't. Many of the reservations that he expresses come later in the conversation, as things become or start to become more concrete, as the agent continues to push the idea of meeting, to push the idea of talking to the minor. The reservations are expressed sort of later in the conversation. For example, if you start to look around the addendum at approximately page 827, that sort of area, in the joint appendix. He made the inquiry of the fictitious mother as to whether she was going to get the fictitious 12-year-old. There is that question. I don't think that properly read, it can actually be read as him sort of having any interest in the 12-year-old. The 12-year-old is not Samantha. That's a different child. I believe the 12-year-old's name may have been Emily, I think. She's referenced throughout the conversation, and he shows no interest. Apart from sort of this initial, I'm talking to you about what's going on, I want to know what you're doing, I want to know why you're doing it, he does ask that question. But otherwise, you don't see any attempts to engage with the 12-year-old. It's always with the 15-year-old, the Sammy-Samantha character. But I do think that there's a language, there's a line in Pullman that I think encapsulates a lot of what was going on here. And Pullman talks about how the government agent was playing this role of a parent who had made a, quote, firm decision about their children's sexual education. And the Ninth Circuit recognizes that, you know, parental consent is not a defense to statutory rape, but that it can have an impact on the self-struggle to resist ordinary temptations. And the Ninth Circuit notes this is particularly so where, and it says, and I quote, the parent does not merely consent, but casts the activity as an act of parental responsibility and the selection of a sexual mentor as an expression of friendship and confidence. And I think that's what you see when you see the later reluctance expressed. What you see the agent coming back with is this expression of friendship and confidence. You see the agent saying, I have chosen you because you're concerned. I have chosen you because you care about our comfort. And you repeatedly see the agent very much trying to form this bond with Mr. Hinkle. You see it as well when Mr. Hinkle talks about his own personal sexual interests. You see the agent saying. But even before all that, if you go back to what seems to me the crucial communication here, which is at the beginning, he's got an ad that says, what, open-minded mom, 38, with daughter. And so in the first communication he asks how old the daughter is. That's before there's. He does not ask in the first communication how old the daughter is. In the first communication he writes with some of his interests. And he writes a scenario not knowing anything about age. At that point there's no illegality disclosed. The agent writes back, and this actually follows the same pattern of the communications in Gamache. They actually line up one for one. The agent writes back with another vague, do you mind if she's young? I want to introduce her to sex. The point being here, you're right, there were these intervening things. But the point being before there was any development of what you've been describing as a relationship or trying to establish friendship, he finds out that she's 15, is offered an opportunity to end it. And it's then his next communication at that point where he says, no, it is not over, exclamation point. I want to talk more, exclamation point. I'm very intrigued by it all. Such taboo and naughty play, exclamation, exclamation, exclamation, exclamation. All of that occurs before these other events of enticement that you're describing to us. Hasn't he already put his cards on the table, though, at that point? I don't think that his communication there occurred before the inducement has been applied. Because at that point the inducement is the purported mother has already been clear that she as a parent is looking for a partner for her child. And she's also already validating Mr. Hinkle's sort of non-completely normal sexual interest. She's already validating him. She's already accepting him for who he is, who he's putting out there, which you see resonances of in Pullman talking about this is a man who's looking for something that's not considered the norm. But none of that answers the question of why, particularly since early on, he brushes aside this notion that she's only 15 and the invitation that they end the conversation. And he goes ahead with the communication Judge Keaner read. None of that addresses the question of why it shouldn't be for the jury rather than for the three of us to determine whether or not that's an improper inducement. I mean, I have argued and I continue to argue that there was insufficient evidence. However, there were other errors here that I think help to explain why the jury may have returned a conviction despite the insufficient evidence. And I think that's where the evidentiary arguments and the jury instruction arguments tie in here. The evidentiary arguments, you have extremely prejudicial and irrelevant evidence coming in. I particularly would note the photographs of Mr. Hankel. The district court. Why doesn't that have relevance with respect to predisposition? This court and the Supreme Court have both been very careful in Gamache. Nor is the inference permissible that the tendency to engage in unusual, albeit legal, sexual activity with an adult indicates a predisposition towards pedophilia. You have pictures of Mr. Hankel alone engaged in adult activity. The pictures are shocking, likely to the jury. You know, perhaps even disgusting. And you have these pictures being put forward. They show no interest. They should have nothing to do with children. And they're images that would really get in someone's head. These come at the jury. And there's no, you know, the court itself in admitting these makes statements that are quite confused. It says things like, the photos themselves don't show that he wants involvement with the children. And I don't think dressing up like that makes him a pedophile. And the fact is that it doesn't. It's an unusual sexual practice that he enjoys, has no connection to children. Those should never have been admitted. Similarly, you have the exclusion of evidence that would show Mr. Hankel's state of mind long before he had any contact with government agents. There's a conversation that he has with someone purporting to be a 40-year-old woman, where he's perfectly willing to engage in the same type of fantasy discussions. The person at the outset says, you know, it's sort of like I saw your ad. And it's a similar sort of father-daughter ad that he's placed. She says, I'm 40, I'm too old. He says, no, you're not. And they engage in a very similar sort of, the language is even similar that they use. That was exhibit B at trial. It was not admitted, but it is in our agenda. So you have the evidentiary problems, and then you also have an instructional problem. And whatever Gamache, you know, Gamache doesn't go as far as to say entrapment is a matter of law. But Gamache does recognize that this type of conduct needs an entrapment instruction. And I think when you combine Gamache with Montagnez, which talks about the instruction needs to be tailored to the type of entrapment at issue in the case, the instruction here was not tailored. It was very general. It did not give the jury any guidance. It did not give the Gamache factors for predisposition. It did not explain to the jury what kind of pressure would be excessive, what kind of appeal would be undue. It did not tell them, in short, that this type of conduct could be inducement, improper inducement. And Gamache and Montagnez combined say that the jury needs to be told that. So when you take this whole case in context, I would argue that there was insufficient evidence, and the case should be reversed on that basis. But at the very least, the jury instructions were incorrect. On the photos, I understood the trial judge as having a slightly different rationale. I understood him saying the photos were evidence of the conduct he was anticipating or proposing to engage in with the child, and therefore went to his intent to commit the illegal act. I don't see here- As opposed to necessarily just predisposition. The only intent that had to be shown here was intent to entice. It didn't matter whether he was going to do A, B, C with the child. It was not contested that Mr. Hinkle was into certain types of sexual activities, that that's what he was interested in. I see no relevance for showing what exactly he was going to do with the child, and I don't also see how a photo of himself completely alone, on completely sort of the other side, being the submissive party, has any relevance for what he would do. Did he forward all these photos? No. The photos were simply found on his computer. They were never forwarded to anyone in this case. Thank you. Was there a favorable limine ruling that got reversed because the judge says it was opened up by the defense? You are maybe referring to the text communications, and that is sort of a complicated- The judge initially said that there were text messages exchanged between the government agent and Mr. Hinkle. They were never actually introduced at trial. The government sought to introduce them, but they only had one side of the conversation. They only had Mr. Hinkle to the agent, not the agent to Mr. Hinkle. And the government tried to elicit testimony sort of explaining that gap, once the defendant asked some questions about them, and they were unable to get enough testimony explaining the gap, so the court said you haven't laid a foundation. I'm not letting the text in no matter what. The court then did allow one of the agents to read two of the texts, and we did make an argument that he should have then allowed that agent to read the third text solely on that subject. But if that's what Your Honor is thinking of, the texts themselves were not introduced. They're not an exhibit. There's just oral testimony about two of them. Okay. Your Honors, may it please the Court, Randall Crum on behalf of the government. The first issue that was discussed was the sort of sufficiency of the evidence on the government's part to rebut the evidence of entrapment or inducement that got past the threshold and allowed for an instruction to be given. I think that, as the Court has pointed out, this case is distinguishable from those where the two that it points to have been found as a matter of law to represent the kind of entrapment where it's not even given to the jury. That was the Pellman case and the Kennedy case were the two where they found that, in fact, it shouldn't be given to the jury at all. And I think it is clearly distinguishable primarily on grounds the Court has already acknowledged first is the ready acceptance of the defendant of the proposal. And, in fact, the proposal spelled out immediately within the first couple of exchanges the nature of the relationship. One of the things, obviously, is clear from Pellman and Kennedy is that it sometimes took days or even weeks before it was clear that the officer running the sting was proposing that there would be sex with minors. It took a while for the person to figure out during that time what relationship developed. There simply wasn't time for that here. The proposal, as put into the ad, immediately said it was a mother-daughter relationship. Within two more messages you knew that it was with an underage daughter and the person was still on board. So it really takes it out of the kind of context where one might say that the facts are so egregious or the sense of taking advantage so strong we wouldn't even let the jury address the issue. So I think it was appropriately given to the jury. And the question then turns on primarily the arguments made towards the end and to the argument about whether there were any trial errors that would undermine the jury's decision to find, as it did, that any suggestion of improper inducement was rebutted by the evidence in the case of, among other things, the ready response of the defendant and evidence suggesting that there was some predisposition to this kind of conduct. And I would argue that there hasn't been any identification of any errors that rise to the level that would call for overturning the verdict, on this case where it was an extensive evidentiary record and they had ample reason to sit through it and decide it as they did. With respect to the first, what has been pointed out, the question about the adult pictures. And we argue that it arguably was weighed, it was certainly fronted by the defendant. Whether that constitutes a waiver, it certainly undermines the idea that putting these pictures in was so harmful to the defendant. For one thing, as Judge Paglia said, the district court's rationale for admitting them is not without merit. This is a case, for one thing, some of the things that he was wearing, these pictures taken of him, were things that were in the car, in the truck. So there was a linkage to the case. But there was also other linkages, which the district court noted, which is it showed him to be willing to engage in a certain type of role-playing. Now, in the role-playing, he was playing the role of the minor. But within the first few messages, you see him flipping that around and proposing exactly the same kinds of activities in which he's playing the daddy and the young girl is playing the role of the minor. So there was a link between what was shown and what he proposed to do that the jury could reasonably have considered the disevidence. So this was a person who did not merely fantasize in words about these kinds of encounters, but a person who went further than that. And for those reasons, there was at least enough reason to let them be put in front of the jury and for the jury to decide what to do with them. Now, it's worth noting also that the defense counsel made good use of them for the defense because a big part of the defense was that he did this as sort of an adult type of activity and that some of the things in the truck were actually for that purpose. The pictures actually helped in making that argument, which is one of the reasons why the government only called attention to one of them. The defense counsel brought up many more of them on cross-examination because, in fact, they were helpful, all of which sort of notates against the argument that any error, if there was one, in admitting them was harmful or requires reversal of the verdict. Another question that was raised was the question of these chat room discussions, but I think that's easily dispatched. These were conversations found on a computer from approximately four years earlier, the context of which was unknown. And certainly the judge was not required to consider them sufficiently related to the circumstances of this case to require that they be admitted as sort of sense impressions or a sense of present intent. Case laws put it on this court's Cianci case that the circumstances have to be shown to be similar enough that we would draw the conclusion that the reaction in one case would be the same as the reaction in the case that we really care about. In this case, we don't have any of that information. We found this fragment of a communication on a computer and anything else that's set out about it now is not in the record and was not available, wouldn't have been available to the jury to assess its relevance, so it was properly excluded. And finally, on the issue of the instructions, it's worth pointing out we argued primarily that the instructions were sufficient if relatively abstract and not as lengthy as the defendant would have preferred, but that they adequately placed the issue in front of the jury. But another part, a requirement in every case where the defendant is arguing his instructions should be given, is he has to show that they represent the correct statement of the law. And quite a bit of what was argued to be included was information that came from outside the circuit, either from the Eighth Circuit or in the Young case or the Pelman case from the Ninth Circuit. This court hasn't adopted that specific language, hasn't adopted that specific list of factors that was used in the inducement instruction particularly, and so there's no reason to believe that the court had an obligation to include that information, which is not recognized in this court as binding, in describing what inducement is to instruct the jury. And even though the part on presupposition did come from this court's decision in Gamache, it's worth pointing out that that was in the context of discussing the things to be considered by a court in deciding whether to give an instruction on entrapment in the first place. So specifically it says, these are the things the court must consider in deciding whether to instruct on entrapment. That may be a different thing than what we ask the jury to consider, especially when it's a close case, what this court is saying to the district court is, it can be at least this, that these factors are on the line between whether there's minimally sufficient evidence to give it to the jury, you can consider these things. But that's not the same as saying that every jury must always consider those very same things. Those are two different contexts, and it doesn't point to any case that says that these are instructions that have to be given. Given that, I think the instructions that were given, which were balanced in the sense that they did not focus, as was the case in Montana, purely on violent cases or cases of violent threats, but actually included verbal persuasion, said you can't talk someone into something that they otherwise weren't willing to do. They covered the ground, that they were adequate under the circumstances of the case to put the case to the jury, and they haven't shown that any lack of specificity undermined the validity of the verdict. If the court doesn't have any questions about the other matters, we'll rely on a brief for those. Thank you, Your Honor. Just a few points, sort of going in the same order as the government took them. If you actually look at the facts of Pullman and Cannaday, they're quite similar. Once the illegality is revealed, those defendants also accept it. There's no hesitation. What Your Honors were asking about at the beginning, there's no backing off at the beginning. The discussion that you see between the agents and the defendants in Pullman and Cannaday is only different in the respect that the agents keep teasing the illegality without saying it, and the defendants keep trying to get at it. It's as though the agents are trying to get the defendants to say it first, which the court in the dissent in Pullman actually points to. Hey, look, it's Pullman who first suggests having sex with minors. And that's in part because of this teasing back and forth. That is a distinction without a difference here. Moving to the pictures argument, that's absolutely not waived. Mr. Hinkle did not introduce any of the pictures. He objected to their introduction at trial. He maintained that objection from the beginning through to the end. Of course, once the pictures are in, that's what a defense attorney does, has to do what he can with the evidence that's there. But he did not waive any argument about that. And they don't become harmless simply because Mr. Hinkle made arguments about them. These are, I would argue, searing images that were really stuck out. They weren't sent to anyone in the case, and they would have really stuck out in the jury's mind. What do you say to the argument that they illustrate the notion that his version of his interests would align with having a minor involved in having sex? I simply don't see that in the pictures. I mean, the fact that he's willing to dress up and take photos of himself doesn't show anything with minors. There's no minors in the pictures. There's no other people in the pictures at all. But he is wearing children's clothes in some of the pictures. Well, he's wearing sort of unidentifiable clothing. I mean, there's like tutus. Are they adult lingerie? We don't really know what they are. But he's completely alone. He's an adult. He can take those pictures. I would also argue that the fact that the conversation with the previous chat, which is the very end of the appendix, the chat with the 40-year-old woman, the fact that that was four years earlier is what makes it relevant. And it's very similar. The language that Mr. Hinkle uses is very similar to what's used in the conversation with the agent here.  I mean, how does it come in? State of mind, Your Honor. State of mind with four years earlier? Yes, because... State of mind is normally a present-sense impression. For the predisposition analysis, the government has to show that there was predisposition independent of the government inducement. That's true. In order to rebut that, Mr. Hinkle here has very clearly... Did the government show any predisposition to go back four years or anything like it? They didn't, but... May I finish? Yes. It's for Mr. Hinkle to be able to show that long before this thing ever happened, before there was any thought of it, he's having the same type of fantasy play with an adult. But it's not the child that interested him in this case. It's the type of conduct. And if there's no further questions, I would rest on my brief for the rest of the point. Thank you.